IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT FOUNTAIN, | : | Case No. 1:06-CV-098 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | ORDER GRANTING |
| WELLPOINT, INC., | : | DEFENDANT'S MOTION FOR |
| | : | SUMMARY JUDGMENT |
| Defendant. | : | |
| | : | |

This matter is before the Court on Defendant WellPoint Inc.'s Motion for Summary Judgment (doc. 17), Plaintiff Robert Fountain's Memorandum in Opposition to Defendant's Motion (doc. 19), and Defendant's Reply Memorandum (doc. 22).

Fountain asserts claims for retaliation under the Family and Medical Leave Act ("FMLA"), disability discrimination under the Americans with Disabilities Act ("ADA") and Ohio Revised Code Chapter 4112, and violation of Ohio Public Policy against his former employer, Defendant WellPoint, Inc.  WellPoint moves for summary judgment as to all of Plaintiff's claims.  For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment.

I.      **BACKGROUND**

Fountain was employed by Defendant WellPoint, Inc.'s predecessors, Anthem, from August 1987 until his termination in January 2005.  In the mid-1990s, Fountain was assigned to work on the FACETS system, a health insurance claims processing system developed by

1

Anthem.[1]  (Fountain Dep. 24-25.)  Fountain soon took the role of manager of the configuration

team for the new software. (Id. at 25-26.)  In 2000, Anthem's Central Region adopted the

FACETS claims processing system.  (Id. at 30-31.)    Between 2001 and 2003, Fountain was an

executive advisor of planning for various projects related to FACETS, including the

development of application components, the management of costs structures, and budgetary

analysis.  (Kew Dep. 10-11; Beer Dep. 14-15.)  In this role, Fountain reported to Barbara Kew,

who was the Vice President responsible for technology services and support.  (Kew Dep. 5,10-

11; Fountain Dep. 30-31.)

        In 2003, Anthem decided to implement FACETS on a multiregional level, requiring

introduction of the program to the Southeast and West Regions of Anthem's operations.  Lori

Beer, Executive Director of West Information Systems, directed the transition and oversaw the

newly created Multiregional FACETS Center of Excellence ("Center of Excellence").  (Beer

Dep. 6-7, 14-16; Fountain Dep. 33-35.)  During the fourth quarter of 2003, Fountain joined the

Center of Excellence as its project leader, working under the supervision of Beer.  (Beer Dep.

17-21; Fountain Dep. 33-35.)

        During 2002 and 2003, Fountain received positive performance reviews from Kew and

Beer.  (See Kew Dep. Exs. 2-3.)  According to WellPoint, Fountain's performance began to

decline in early 2004.  Around that time, certain individuals associated with the Center of

Excellence notified Beer of various concerns they had about Fountain's performance.  (See Beer

---

[1] Before managing the FACETS project, Fountain held a variety of positions including
team leader of a group of programmers, director of development, director for the operations
center for a health claims processing system, and manager of a project working on a reporting
system.  (Id. at 17-23.)

Dep. 36-44.)  Specifically, several individuals noted that Fountain appeared to be experiencing difficulty focusing on certain tasks and was not moving forward with specific projects that were necessary for the multiregional implementation of FACETS.  (Id.)  Beer personally observed that Fountain was having difficulty putting plans in place and meeting goals.  (Id. at 44.)

Beer addressed these concerns with Fountain, and they agreed on specific goals upon which he was to concentrate during 2004.  (Beer Dep. 222-27, Exs. 1-2.)  To aid in the achievement of these goals, they created a development plan on May 13, 2004, which included such objectives as improving communication skills, improving skills in holding others accountable, handling issues in a firm and decisive manner, and building relationships and establishing leadership with business partners.  (Id. at 31-32, Ex. 2.)

Around the same time, Fountain confided in Beer that he was having problems at home and was concerned that his wife's emotional health was affecting the safety of his children.  (Id. at 44-46; Fountain Dep. 39.)  Beer suggested to Fountain that he consider taking a leave of absence to deal with these issues.  (Beer Dep. 47; Fountain Dep. 40.)  After this encounter, Fountain contacted human resources and was directed to Anthem's Leave of Absences Group. On the FMLA and short-term disability forms that Fountain completed as part of his official request for leave, Fountain cited his own depression rather than problems with his wife's mental health as the basis for his request.  (See Fountain Dep. ex. 3.)  Fountain never informed Beer that he was taking leave because of his own depression.  (Beer Dep. 48-49; Fountain Dep. 60.)

According to WellPoint, Fountain took approved leave under the FMLA from June 21, 2004 until July 16, 2004, during which time he received short-term disability benefits.[2]  (See Fountain Dep. 40-44, 55-58, Ex. 1; Peat Dep. 13.) Fountain claims that when he began his leave of absence, Beer ceased communicating with him.  Fountain frequently tried to contact Beer to make arrangements for to work on a project on a reduced schedule while he was on leave, but she never returned his calls.  (See Fountain Dep. 38, 33-46, 52-53.)

While Fountain was out on leave, Anthem and WellPoint were in the process of merging. (Beer Dep. 62.)  During the merger, the company halted the multiregional implementation of FACETS and determined that the West and Southeast Regions should instead adopt WellPoint's California-based claims processing system.  (Id. at 62-63; Kew Dep. 20-21.)  As a result of this decision, the company eliminated the Center of Excellence in June 2004, and transferred all of the employees assigned to the Center to the Central Region, the only region still using FACETS.[3]  (Beer Dep. 63-64; Toolan Dep. 7-9, 11-12.)   The transfer apparently did not require the employees to change locations.  Instead, they merely reported to a new supervisor, Debra

---

[2] Fountain contends that the return date was only an estimate and was "to be determined." (See Fountain Dep. exs. 1, 3, 4.)  In any case, Fountain remained on leave until July 23, 2004. (Id. at 64.)

[3] At least nineteen Center of Excellence employees were transferred to the Central Region during the merger, including Fountain, Bob Ash, Michael Behan, Brenda Chaplin-Chase, Nancy Chapman, Carl Cullison, Greg Dunaway, Dawn Ficorilli, Shirley Halterman, Melissa Hinch, Don Hyndman, Susan Laney, Frank Pater, Jim Rolf, Bob Stewart, Sandy Swearingen, Colleen Trimbur, Holly Williamson, and Michael Yaggi.  (Beer Dep. 75.)  Fountain argues that the transfer was not temporary.  Rather, he contends that the Center of Excellence team was transferred intact and that he was the only employee not ultimately given a position in the Central Division.

4

Toolan, the Director of FACETS and Information Technology for the Central Region. (Beer Dep. 63-64; Toolan Dep. 7-9, 11-12.)

Fountain returned from leave to find that the Center of Excellence no longer existed. According to Fountain, he was never contacted about a transfer to the Central Region and did not know who he was supposed to report to when he returned to work. One of Fountain's coworkers, Jim Rolf, approached him and informed him that he no longer had the same job and should report to Chuck Rolph. (Fountain Dep. 67.) When Fountain contacted Rolph, he learned that he was not technically assigned to Rolph, but that Rolph had a two-week testing project and needed Fountain's assistance for that short period. (Rolph Dep. at 8; Fountain Dep. at 69; Toolan Dep. at 14.) Fountain once again attempted to contact Beer, but she did not return his call. (Id. at 68.) Beer testified that after Fountain returned, her assistant tried unsuccessfully to set up a time for the two to meet. (Beer Dep. at 65.) By the time Beer finally spoke directly with Fountain, he indicated that there was no need for them to meet. (Id.)

During this same time frame, according to WellPoint, Toolan spoke with the senior management team about finding a permanent position for Fountain. (Toolan Dep. 14, 18-19; Kew Dep. 22.) Toolan indicated that Fountain had come under her supervision and that she did not necessarily have a need for someone with his skills. (Id.) Barbara Kew, the Vice President of E-Business Technology, said that she had an immediate need for someone with FACETS knowledge and could use Fountain. (Id.) Shortly after the meeting, Kew contacted Elizabeth Pickett, the Executive Director of E-business, and encouraged Pickett to offer Fountain a project manager position that was available in Pickett's department. (Pickett Dep. 11-13; Kew Dep. 24-25.) The project manager position was characterized as a level P5 position – one step down from

5

Fountain's previous position, which was at level P6.  (Kew Dep. 25-26.)  The decrease in levels would not affect Fountain's base pay, but it negatively affected Fountain's bonus potential and salary range.  (Pickett Dep. 14-15; Fountain Dep. 71-73.)  At the time, there were no P6 positions available in e-business that Fountain qualified for and there was no discussion among the senior management team about trying to find Fountain a position of the same level.  (Kew Dep. at 24.)

Kew claims that she contacted Fountain to tell him about the available position in the e-business group.  (Kew Dep. 25.)  Kew briefly described the position and told him he should speak with Pickett about the details.  (Id.)  According to Kew, Fountain was interested in speaking with Pickett.  (Id.)  Pickett testified that when she spoke with Fountain, she was under the impression that someone from Human Resources had already contacted him about the position and that he had agreed to the transfer.  (Pickett Dep. 21-22.)  Pickett told Fountain that the new position was a project manager role and provided a description of his responsibilities. (Id. at 23.)  She also informed Fountain that the position was at a level P5 rather than P6, but assured him that his base pay would remain unchanged.[4]  (Id. at 24; Fountain Dep. 71.)  Like the transfer to the Central Region, this reassignment did not involve a physical transfer.

Fountain felt that he did not really have a choice in the matter and was surprised that the company had not asked for more input from him as to what type of position he would like to

---

[4] Fountain claims that during this conversation Pickett apologized for the confusion over who Fountain was to report to when he returned from leave, and after speaking with Pickett, Fountain had the impression that he had already been officially reporting to Pickett but had been unaware that he had been transferred to her supervision.  (Fountain Dep. 71-72.)  Indeed, Pickett testified that she had ultimately supervised the project with which Fountain had assisted Rolph. (Pickett Dep. 17-18.)  Therefore, Fountain had already been temporarily working under her supervision without his knowledge.

6

take. (See Fountain Dep. 121-22.) He testified that, in the past, WellPoint had consulted him before changing his assignment and that typically he had been able to provide such input. (Id.) Nonetheless, Fountain attempted to remain positive about the new position.

During his initial discussions with Pickett, Fountain indicated that he was concerned about his lack of familiarity and experience with e-business systems. (See Pickett Dep. 24; Fountain Dep. 75.) Pickett reassured Fountain that "given his background and given his experience in project management that e-business in many ways is like managing any other project work." (Pickett Dep. 25.) She also told Fountain that she and the rest of the e-business team would help him with the knowledge that he would need in the new position. (Id.)

Shortly after transferring to e-business, Fountain participated in a conference call with Pickett and Beer to discuss his performance while under Beer's supervision during the first half of 2004.[5] (Pickett Dep. 31, 33; Fountain Dep. 76-77.) In this evaluation, Beer rated Fountain as "highly successful" in one area, "successful" in six areas, "mixed results" in five areas, and "not meeting expectations" in one area. His overall rating indicated "mixed results." (Beer Dep. ex. 4.) Some of Beer's comments reflected that Fountain had trouble focusing, problems communicating effectively, and difficulty taking a proactive role as a leader. (Id.) According to Fountain, Beer never mentioned any concerns about his performance prior to his FMLA leave. (Fountain Dep. 47.) Fountain asserts that during the conference call he protested the fairness of at least two low ratings. (Id. at 78-79.) According to Beer, Fountain protested some specific wording in the evaluation but not the ratings themselves. (Beer Dep. 58.) Beer agreed to make

_____

[5] Pickett requested the conference call because it was standard for her to request a performance evaluation from an outgoing manager. (Pickett Dep. 31-32.)

some minor changes before the evaluation was finalized.  (Fountain Dep. 78-79; Beer Dep. 57-58, Ex. 5; Pickett Dep. 33-34.)

During the time that Fountain worked for Pickett, Fountain mentioned to Pickett that he had been out on leave due to his wife's illness and his concerns about leaving his children in her care.  Pickett encouraged Fountain to seek counseling through the Company's Employee Assistance Program ("EAP") to address the challenges he described.  (Pickett Dep. 27.)  While Pickett was aware of Fountain's family problems, Fountain never told Pickett that he also suffered from depression.  (Pickett Dep. 25-25, 28; Fountain Dep. 116.)  Nor did Fountain request any accommodations related to his illness after returning from leave.  (Fountain Dep. 76.)  He did request that he be allowed to work from home on certain occasions, but he did not cite his or his wife's mental illness as a reason for the request.  Instead, Fountain told Pickett that the request was due to some outside personal commitment that he had, including youth sports coaching.  Pickett initially accommodated the request.  (Fountain Dep. 118-19.)

A few months after Fountain transferred to e-business, Pickett began receiving feedback that Fountain had missed several meetings and was not attentive during the meetings he attended, often did not respond to e-mail and voice mail messages, and failed to meet deadlines for certain projects.  (Pickett Dep. at 44-49, 52-53, 60.)  Pickett discussed some of these concerns with Fountain during their weekly meetings.  (Pickett Dep. 42-43.)  Fountain claims that several of the problems Pickett cited were related to his difficulty transitioning into the new position and learning to navigate the electronic databases and software utilized by the e-business group.

8

Pickett testified specifically that she received complaints from Mike Meyer and Brad Crawford, both of whom were members of her team, and from Fountain's business customers that Fountain had missed certain meetings.  (Pickett Dep. 44-45.)  As to these allegations, Fountain claims that he had informed Pickett of his inability to attend at least one of the meetings and that he had missed the others due to miscommunication with coworkers and difficulty accessing the electronic planner.  (Fountain Dep. 85-86, 89-91, 108-09.)  Fountain, like other co-workers, had difficulty with Lotus Notes, an electronic meeting scheduler.  (See Pickett Dep. 43-44.)  Pickett testified, however, that even after the company resolved the problem with Lotus Notes, Fountain continued to miss meetings.  (Id. at 44.)

Pickett also testified that she received repeated feedback about Fountain's failure to complete project information in a company database known as known as Planview, a tool used to track project information, project plans, and resources.  (Id. at 42-43, 49-51.)  Fountain had indicated to Pickett soon after transferring to e-business that he was having trouble using Planview.  (Id. at 42-43.)  Pickett advised Fountain to work with the Planview administrator to resolve his issues, referred him to other project managers who had successfully learned the program, and offered him training.  (Id. at 43, 51.)  It is unclear whether Fountain took advantage of these offers; in any case, Fountain testified that he never felt he was denied any request for assistance or training.  (Fountain Dep. 96-97.)  Despite the availability of assistance, Fountain continued to experience problems using Planview and was unable to meet deadlines.  (Pickett Dep. 50-51.)

Somewhat related to the Planview issues, one of Fountain's customers, Cindy Kelly, also contacted Pickett about problems with Fountain, specifically indicating that Fountain was not

"delivering the project milestone plan to the business so that they could understand the resources that they needed to allocate and so that they could have a definite delivery date for the project." (Id. at 53.)  This project plan was part of the information that Fountain had failed to report in Planview.  However, according to Pickett, Fountain's failure to deliver the plan to the customer was unrelated to Fountain's difficulty using Planview because knowledge of Planview was not necessary to develop the actual plan.  In other words, Fountain "could have done a milestone project plan independent of Planview and delivered it to the business."  (Id. at 54-55.)  Fountain concedes that he was not meeting all of his deadlines, but claims that from his perspective he was not necessarily behind on any projects based on overall timelines.  (Fountain Dep. 95-96.)

In addition to these problems, certain members of Pickett's team complained that Fountain was rarely present at work, often coming in only one day a week, and was difficult to locate.  (Pickett Dep. 57.)  Finally, the same team members also expressed concerns that they had detected alcohol on Fountain's breath at work.  (Id. at 67.)

With guidance from the human resources department, Pickett spoke to Fountain regarding his performance and indicated to him that he might get a written warning.  (Peat Dep. 22-23, 26-27; Fountain Dep. 91.)  On December 20, 2004, Pickett issued Fountain a written warning, also called "Corrective Action Documentation ."[6]  (Fountain Dep. 91; Pickett Dep. 81, Ex. 8.)  The warning included four goals Fountain was required to meet within sixty days, and stated that termination could occur if the goals were not met in sixty days or if "sufficient progress toward meeting the stated expectations" was not made at any time during the period.

---

[6] The warning included examples of complaints from Fountain's peers about his performance.  Fountain added his own comments to the warning, noting the challenging circumstances surrounding his new position.  (Pickett Dep Ex. 8.)

(Pickett Dep. Ex. 8.) The goals included: (1) responding to all voicemail, email, and meeting invitations by 4:00 p.m. within the same business day; (2) submitting all status reports, planning documentation, time tracking, and other project information on time as requested; (3) being available during the core business hours of 8 a.m. to 5 p.m. each day, with certain exceptions; and (4) meeting goals 1-3 as reflected by business partner and peer feedback. (Id.) Fountain claims that when he and Pickett discussed the document, he became frustrated that none of his peers had approached him directly to address their concerns. (Fountain Dep. 93-94; Pickett Dep. 78-80.)

Pickett tracked Fountain's progress over the following weeks and established regular meetings with Fountain. (Pickett Dep. 84-85, 88-89, Exs. 10, 11.) After four weeks, Fountain was only meeting two of the four performance goals. Accordingly, Pickett and a human resources manager, Sean McIntyre, decided to terminate Fountain on January 25, 2006. (Pickett Dep. 25-26, Ex. 11; McIntyre Dep. 19.) The termination occurred before the end of the sixty-day warning period because Pickett determined that Fountain was not making sufficient progress toward the goals, and that though his performance had improved slightly at the outset it had once again begun to decline. At that time, Fountain had been diagnosed with depression and was taking medication.[7] (Fountain Dep. 141-42.) However, WellPoint asserts that none of the decision-makers, including Beer, Toolan, Pickett, and Kew, were aware that Fountain suffered from depression. (Beer Dep. 45-46; Toolan Dep. 16; Pickett Dep. 26; Kew Dep. 18-19.)

## II.    SUMMARY JUDGMENT STANDARD

---

[7] Fountain had previously sought treatment for stress from a therapist and again in late 2002 and 2003 for anxiety and interpersonal relationship issues. (Fountain Dep. at 139-140.)

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." Id. at 252.

In reviewing the evidence set forth by both the moving and non-moving parties, the Court must carefully review "those portions of the submitted evidence *designated* by" both parties. Guarino v. Brookfield Twp. Tr's., 980 F.2d 399, 410 (6th Cir. 1992) (emphasis added). However, the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party." Id.

12

## III.    ANALYSIS

WellPoint moves for summary judgment as to all of Fountain's claims.  Fountain opposes

WellPoint's motion only as to his FMLA retaliation[8] and statutory disability discrimination

---

[8]  The Sixth Circuit recognizes two distinct theories of recovery – interference and retaliation – under the FMLA, 29 U.S.C. 2601 et seq.:

> The "entitlement" or "interference" theory arises from § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter," and from § 2614(a)(1), which provides that "any eligible employee who takes leave ... shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." The "retaliation" or "discrimination" theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

Arban v. West Pub. Corp., 345 F.3d 390, 400-01 (6th Cir. 2003).

In his response to WellPoint's Motion for Summary Judgment, Fountain raises both an FMLA interference and retaliation claim.  Citing Tucker v. Union of Needletrades, Indus. & Textile Employees, 407 F.3d 784, 788 (6th Cir. 2005), WellPoint argues that the Court should not consider the alleged interference claim because Fountain raised this claim for the first time in tits response to WellPoint's Motion for Summary Judgment.  Indeed, the Court finds that Fountain did not assert an FMLA interference claim in his Complaint, and is therefore barred from raising this claim for the first time at this stage in the litigation.  See id.  Fountain pled his FMLA claim in Count 1 of his Complaint, which he captioned "FMLA Retaliation, 29 U.S.C. § 2601 et seq."  (Doc. 1 at 4.)  Throughout Count 1, Fountain frames his claim as a retaliation claim, alleging as follows:

> In response to Plaintiff exercising his FMLA rights, Defendant maliciously and willfully *retaliated against Plaintiff by various acts, including but not limited to demoting and subsequently and subsequently terminated [sic.] Plaintiff's employment in retaliation for his use of FMLA protected leave.*

> The unwarranted *acts of retaliation* were directed towards Plaintiff because he exercised his FMLA rights.

> Defendant's conduct violates the FMLA and Plaintiff is entitled to judgment.

> As a direct and consequential result of Defendant's *retaliation*, Plaintiff has suffered *injuries* for which he is entitled to recovery.

(Doc. 1 ¶¶ 30-33 (emphasis added).)

claims on the basis that questions of material fact preclude summary judgment, but does not

oppose WellPoint's motion as to his public policy claim.  (See doc. 19 at 1, n. 1.)  Accordingly,

the Court grants summary judgment as to Fountain's public policy claim and addresses the

remainder of Fountain's claims below.

To establish his FMLA or disability discrimination claims, Fountain must produce either

direct or circumstantial evidence of retaliation or discrimination.  DiCarlo v. Potter, 358 F.3d

408, 414 (6th Cir. 2004).  Direct evidence is "evidence that proves the existence of a fact without

requiring any inferences."  Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th

Cir. 2004).  Fountain presents no direct evidence that WellPoint unlawfully discriminated or

retaliated against him on any of the alleged bases.  Therefore, Fountain must make his case with

indirect evidence under the burden-shifting framework set forth in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1973).  See Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1184-85

(6th Cir. 1996).

Under the McDonnell Douglas analysis, a plaintiff must first make a prima facie showing

on the discrimination or retaliation claim.  If the plaintiff makes such a showing, the burden

---

Plaintiff filed his Complaint on February 27, 2006, and had over a year to file a motion to amend his complaint prior to WellPoint moving for summary judgment.  Fountain cannot now attempt to amend his complaint through his opposition to summary judgment.  See Purdy v. U.S. Cellular Corp., No. 3:05-CV-348, 2007 WL 595509, at *3 (E.D. Tenn. Feb. 21, 2007) (refusing to consider an FMLA interference claim that the plaintiff raised for the first time in opposing the Defendant's motion for summary judgment because the plaintiff's complaint raised only an FMLA retaliation claim and made "no mention of a claim for interference in violation of the FMLA," and because the "defendant was not put on notice of this claim until over one year after [the] plaintiff filed this action, during which time [the] plaintiff was free to seek leave to amend her complaint to add such a claim").

shifts to the employer to show a nondiscriminatory reason for its employment decision.

Monette, 90 F.3d at 1186; see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981).  If the employer satisfies this burden of production, then the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was not its true reason but was, in fact, a pretext for illegal discrimination or retaliation.  Burdine, 450 U.S. at 256.  The plaintiff retains the ultimate burden of persuasion at all times.  Id.

Applying this analysis, Fountain first must establish the prima facie elements of FMLA retaliation and disability discrimination.  The remainder of the burden-shifting test is the same for each of the claims.  That is, if Fountain is able to establish a prima facie case on a claim, the burden of production shifts to WellPoint to provide a legitimate, nondiscriminatory reason for its decision to transfer and then to terminate Fountain.  If, on the other hand, Fountain fails to establish a predicate fact necessary to create the presumption of unlawful intent, the burden never shifts to WellPoint.  Monette, 90 F.3d  at 1185.  If WellPoint provides a legitimate, nondiscriminatory explanation for its actions, Fountain is then required to establish that the proffered nondiscriminatory reason is a pretext for unlawful discrimination or retaliation.  Id. at 1186.

## A.      FMLA Retaliation

Fountain alleges that WellPoint retaliated against him for taking FMLA leave by demoting and subsequently terminating him.  WellPoint argues that Fountain's FMLA retaliation claim must fail because Fountain cannot establish a prima facie case of retaliation and because WellPoint had legitimate, nondiscriminatory reasons for reassigning Fountain after his return from FMLA leave and for subsequently terminating him.

The FMLA entitles an eligible employee to twelve weeks of leave during any twelve-month period because of, inter alia, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is unlawful for an employer to discharge or in any other manner discriminate against an individual for opposing any practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(2). To make a prima facie case of FMLA retaliation, Fountain must show that: (1) he availed himself of a protected right under the FMLA, (2) he suffered an adverse employment action, and (3) there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action. Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir. 2006). If Fountain satisfies these three requirements, the burden shifts to WellPoint to proffer a legitimate, nondiscriminatory rationale for transfering Fountain to another position and subsequently terminating him. Id. WellPoint's motive is an integral part of the analysis "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." Edgar, 443 F.3d at 508 (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998)).

**1.     Fountain's Transfer**

Fountain first argues that WellPoint retaliated against him by demoting him upon his return from leave. WellPoint does not dispute the first prong of the prima facie case – that Fountain exercised his FMLA rights. As for the second prong, WellPoint argues that Fountain's transfer from the Central Region to a position in the e-business group does not amount to an adverse employment action. Though Fountain transferred from a position at the P-6 level to a position one step down at the P-5 level, WellPoint claims the transfer was not materially adverse

16

because Fountain received the same base pay. An "adverse employment action" is one that results in a "materially adverse change in the terms and conditions of [plaintiff's] employment." Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id. at 662.

In support of its position, WellPoint cites Kesler v. Barris, Sott, Denn & Driker, PLLC, 482 F. Supp. 2d 886, 911 (E.D. Mich. 2007), for the proposition that the denial of a potential raise or bonus without any diminution of the plaintiff's salary or benefits does not amount to an adverse employment action. Kesler is not dispositive of this case, however, because the plaintiff in Kesler was not reassigned or demoted. Instead, she simply was not awarded a potential bonus. Id. at 893. In the instant case, Fountain's transfer involved more than the mere denial of a bonus: his classification was downgraded from P-6 to P-5 and his salary range and bonus potential decreased. Under such circumstances, the Court finds that Fountain's transfer constitutes an adverse employment action. See Schram v. Schwan's Sales Enterprises, Inc., 124 Fed. App'x 380, 385 (6th Cir. Feb. 25, 2005) (holding that a jury could determine that the plaintiff's transfer to a new position was an adverse employment action because the plaintiff's new position was a step down, involved diminished responsibilities, and did not have as high of a salaray range as his previous position); English v. Baptist Healthcare System, Inc., No. 3:01CV-92-H, 2003 WL 158705, at *4 (W.D. Ky. Jan. 22, 2003) (holding that a jury could determine that the plaintiff's transfer to a new position was an adverse employment action despite the fact that the defendant agreed not to reduce the plaintiff's salary because "the

17

position itself actually commanded a lower salary and was a lower grade than Plaintiff's prior position").

Turning to the third prong of the prima facie case, a causal connection, Fountain cites the fact that his supervisor, Beer, allegedly ceased all communication with him after he left on leave, despite Fountain's repeated attempts to contact her.  While Beer's failure to communicate with Fountain is somewhat suspect, there is no evidence that she played any role in the decision to transfer Fountain to the e-business group.  By the time that decision was made by Toolan and Kew, Beer was no longer supervising Fountain and had little to no contact with him.  Accordingly, Beer's failure to communicate with Fountain throughout his leave period does not evince a causal connection between his transfer and his decision to take leave.  Fountain also argues that the temporal proximity between his transfer and his return from leave demonstrates a causal connection between the two events.  WellPoint transferred Fountain approximately two weeks after he returned from leave and approximately two months after he requested leave.  The Sixth Circuit has affirmed that a plaintiff satisfies the third prong of a prima facie case of FMLA retaliation when the plaintiff can present indirect evidence of a causal connection between the exercise of FMLA rights and the adverse employment action because of the proximity in time between the plaintiff's request for leave and the allegedly adverse action.  See Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 314 (6th Cir. 2001).  Accordingly, Fountain has made a showing of causation sufficient to satisfy the third prong of the prima facie case of retaliation with regard to his transfer.

As such, the burden shifts to WellPoint to articulate a legitimate non-discriminatory reason for transferring Fountain out of the Central Region.  WellPoint easily meets this burden.

18

As described above, WellPoint contends that due to the merger that occurred while Fountain was on leave, the Center for Excellence, and along with it Fountain's position with the company, was eliminated. When Plaintiff returned from leave he was temporarily placed under the supervision of Toolan in the Central Region along with the rest of the former Center of Excellence team. According to WellPoint, there was no need for Fountain's assistance in the Central Region so the company attempted to find a permanent position for him that would best utilize his skills. Toolan spoke with Kew and the other senior managers and they determined that there was immediate need of someone with FACETS knowledge in the e-business group. Accordingly, the company decided to transfer Fountain to a position in that group.

As WellPoint has identified a nondiscriminatory reason for transfering Fountain to e-business, the burden returns to Fountain to prove by the preponderance of the evidence that WellPoint's stated reason for transferring him was in fact a pretext for illegal discrimination. Fountain may establish pretext by showing that WellPoint's proffered reason for the transfer had no basis in fact, did not actually motivate the transfer, or was insufficient to motivate the transfer. Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 883 (6th Cir. 1996) (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994)). Fountain fails to show pretext under any of these methods, pointing to no evidence that WellPoint intentionally transferred him as a result of him taking FMLA leave. At this stage temporal proximity "is not alone sufficient to establish that an employer's legitimate, non-discriminatory reason for discharge was a pretext." Heady v. United States Enrichment Corp., 2005 WL 1950793, at *4 (6th Cir. 2005) (citing Skrjanc, 272 F.3d at 317).

19

Fountain attempts to demonstrate pretext by pointing to inconsistencies in the testimony of his former supervisors and coworkers. These inconsistencies, however, are largely immaterial and do not contradict WellPoint's proffered reason for transferring Fountain. For example, Fountain claims that Toolan's testimony that she announced Fountain's availability to senior management about two weeks after Fountain returned, at the conclusion of the test he was working on with Rolph (see Toolan Dep. 8-9, 14-16), conflicts with Pickett's testimony that prior to Fountain returning from leave, Kew had encouraged her to consider pulling Fountain into her organization (see Pickett Dep. 12, 17-18). Fountain misconstrues the cited testimony in an attempt to create conflict. First, Toolan did not testify that she waited until after the two week testing assignment was completed to talk to management about finding a permanent position for Fountain. Instead, she merely stated that the conversation took place in the summer of 2004. (See Toolan Dep. 8-9, 14-16.) Further, Pickett testified only that a few weeks prior to bringing Fountain over to her group, she had received a phone call from Kew who let her know that Fountain had returned from leave and was available. (Pickett Dep. 12.) Pickett also testified that Kew had called her about Fountain in late June, but at that point they had only discussed the possibility of Fountain assisting Rolph with the testing project on a short-term basis. (Id. at 18-19.) Pickett specifically testified that at the time Fountain was assisting with the testing project, she had not agreed to hire him in a full-time position. (Id. at 20.) Accordingly, Pickett's testimony is not in conflict with Toolan's testimony.

Fountain next claims "while Beer clearly testified that she did not have any conversation with Toolan about Fountain's transition, Toolan testified that she had conversations with Beer about the lack of a permanent position for Fountain. (Doc. 19 at 14 (citing Toolan Dep. 18-19

20

and Beer Dep. 64).)  Contrary to Fountain's assertion, these statements are not inconsistent.

Beer testified that she was not "brought into" discussions with "Barb Kew or Deb Toolan about

eliminating [Fountain's] function, or his position."  (Beer Dep. 64.)  This statement does not

conflict with Toolan's testimony that when she discussed with Beer the likelihood that she would

take over supervision of the Center for Excellence team, she told Beer that she did not have a

permanent position for Fountain in her group.  (Toolan Dep. 17-18.)  Toolan did not testify that

she contacted Beer about moving Fountain into the e-business group.

The Court need not address every alleged inconsistency raised by Fountain.  The Court

reviewed all of the purportedly inconsistent testimony and finds Fountain's arguments meritless.

In nearly all cases, inconsistencies in testimony will arise.  These inconsistencies do not reflect

pretext unless they are material and indicate that the witnesses are inherently unreliable.  See

Joostberns v. United Parcel Services, Inc., 166 Fed. App'x 783, 796 (6th Cir. Jan. 9, 2006).

Fountain further claims that when WellPoint disbanded the Center for Excellence and

transferred the employees to the Central Region, he was the only employee not to receive a

permanent reassignment in the Central Region.  Again, Fountain offers no evidence of this.  Kew

and Beer both testified that the entire Center of Excellence team transferred to Toolan's

supervision during the merger.  However, WellPoint does not dispute this fact.  Fountain points

to no testimony showing that WellPoint intended to place any of the transferred team members in

the Central Region on a permanent basis.  To the contrary, Toolan and Kew both explained that

the company intended the transfer to be temporary and that the company hoped to find

permanent placements for the Center of Excellence employees.  (See Toolan Dep. 11-12; Kew

Dep. 22-23.)  Toolan explained that, at least during that period, employees with FACETS

knowledge remained useful: "They had FACETS knowledge. We were in the middle of consolidation. And if they could be useful, you know, in terms of help, you know, we certainly would look at that." (Toolan Dep. 13-14.) Accordingly, the company had reason to retain them if possible.

Fountain says that the relocation of the Center of Excellence group to the Central Region was not in fact temporary and that every other employee remained in the Central region. However, there is no evidence in the record as to what happened to any of the Center of Excellence employees after the transfer aside from Fountain and Jim Rolf, and the testimony regarding Rolf's ultimate fate does not support Fountain's claim. Toolan specifically testified that Rolf, who had been the director of FACETS under Beer's supervision, was also transferred temporarily to the Central Division and that the transfer was never intended to be permanent because that region already had a director of FACETS. (Toolan Dep. 13.) The company never reassigned Rolf to another position because he resigned after a period of time. (Id.) Viewing the evidence in a light most favorable to Plaintiff, the Court finds that Fountain fails to set forth sufficient evidence creating a question of material fact as to whether WellPoint demoted him in retaliation for taking FMLA leave.

### 2. Fountain's Termination

In contrast to his transfer, Fountain cannot establish a prima facie case of retaliation with regard to his termination. WellPoint does not dispute that Fountain's termination constitutes an adverse employment action; however, the company contends that Fountain fails to meet the third prong of the prima facie case. Indeed, Fountain fails to present any evidence, circumstantial or otherwise, of a causal connection between his termination and the exercise of his FMLA rights.

22

Fountain points only to the temporal proximity – a six to seven month period – between the two events. The Sixth Circuit has repeatedly noted that "cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." Parnell v. West, No. 95-2131, 1997 WL 271751, at *3 (6th Cir. May 21, 1997); see also Nguyen v. City of Cleveland, 229 F.3d 559, 567 (6th Cir. 2000); Lentz v. City of Cleveland, 410 F. Supp. 2d 673, 692 (N.D. Ohio 2006) ("Even if temporal proximity alone sufficed, the Sixth Circuit would generally require a proximity of less than six months.").

Even if Fountain had succeeded in showing a prima facie case of retaliatory discharge, Fountain presents no evidence that WellPoint's proffered reason for terminating him is a pretext for unlawful discrimination. WellPoint contends that it ultimately terminated Fountain due to the performance problems described in detail above.

Again, Fountain attempts to show evidence of pretext, but fails. First, Fountain claims that there is evidence that after he took FMLA leave, his supervisors began to compile documentation of performance problems in anticipation of terminating him. Fountain cites to Dage v. Time Warner, 395 F. Supp. 2d 668, 678-79 (S.D. Ohio 2005) in which this Court found that such evidence can indicate pretext. However, Dage is inapplicable to the instant case because in Dage, the plaintiff identified additional evidence of retaliatory and discriminatory animus tending to cast doubt on the legitimacy of the increased warnings and other disciplinary measures the defendant company doled out to the plaintiff. See id.

Fountain points to the fact that he had generally received positive reviews until after he took FMLA leave, at which point Beer claimed that several of Fountain's colleagues had expressed concerns about Fountain's ability to focus. This assertion contradicts Beer's

23

testimony that she had raised these concerns with him in weekly meetings prior to him taking leave.  (See Beer Dep. 43-45.)  Moreover, Beer was not involved in the decision to terminate Fountain and Pickett did not base the decision on Beer's mid-term review of Fountain's performance.  Instead, Pickett ultimately based her decision to terminate Fountain on her own observation of his inability to meet the performance goals she had set for him in late 2004 and early 2005.

Interestingly, Fountain does not deny Pickett's testimony that he had failed to meet important project deadlines and meetings.  Indeed, during his deposition, he admitted to many of the alleged performance problems.  Nonetheless, Fountain claims he did not perceive the problems to warrant termination.  Fountain attempts to excuse these problems by citing his difficulty with using company software and claims Pickett should have given him more time to adjust.  However, the fact that Fountain believes WellPoint should have excused his failure to meet deadlines and given him another chance to meet his performance goals is irrelevant. Fountain points to no evidence demonstrating that WellPoint's concern about Fountain's performance problems was a pretext for discrimination or retaliation.  Fountain could have done so by showing that other employees similarly failed to meet deadlines, respond to emails and voice mails, or appear at scheduled meetings.  But there is simply no evidence of this.  As such, the Court finds that Fountain has presented no evidence from which a jury could infer pretext. As no issues of material fact exist, the Court dismisses Fountain's claim of FMLA retaliation.

**B.**     **Disability Discrimination**

In addition to alleging FMLA retaliation, Fountain also claims that WellPoint discriminated against him based on his disability or perceived disability in violation of the ADA

24

and Ohio Revised Code Chapter 4112.  Because both federal and Ohio disability discrimination actions require the same analysis, the Court will analyze Fountain's state and federal discrimination claims solely under the ADA.  See Martin v. Barnestille Exempted Vill. Sch. Dist. Bd. of Educ., 209 F.3d 931, 934 n. 2 (6th Cir. 2000). WellPoint moves for summary judgment as to this claim on the basis that Fountain is not disabled and that even if Fountain could establish a prima facie case of disability discrimination, Fountain cannot show that WellPoint's legitimate nondiscriminatory reasons for transferring and subsequently terminating him are pretexts for discrimination.

As described above, the Court has already determined that Fountain presents no evidence indicating that WellPoint's proffered reasons for transferring and subsequently terminating Fountain were pretexts for discrimination.  Accordingly, Fountain's disability discrimination claims necessarily fail, making it unnecessary for the Court to determine whether Fountain would have been able to establish a prima facie case.  The Court therefore grants summary judgment to WellPoint as to all of Fountain's claims.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant WellPoint's Motion for Summary Judgment as to all of Plaintiff's claims.

IT IS SO ORDERED.


S/Susan J. Dlott                             
Susan J. Dlott
United States District Judge